IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ERIC L. WALKER, II,
     Plaintiff / Petitioner,

v.

Case No: 3:22-cv-1466-LC-HTC

SGT. JOSHUA HATTAWAY,
SGT. JOHN REIFSCHNEIDER,
CAPT. COREY SETTLEMIRES,
     Defendants.

_____/

PROVIDED TO DESOTO C. I.
ON _____ FOR MAILING
INMATE INITIALS _____
OFFICER INITIALS _____

## AMENDED COMPLAINT

## A CIVIL RIGHTS COMPLAINT BY A
## PRO SE PRISONER LITIGANT IN ACTION
## UNDER 42 U.S.C. § 1983

## JURY TRIAL REQUESTED

FILED USDC FLND PN
AUG 17 '22 PM 1:33 GM

1

## I.        **PARTIES TO THIS COMPLAINT:**

    Eric L. Walker, II, DC# W17028
    DeSoto Correctional Institution Annex
    13617 Southeast Highway 70
    Arcadia, Florida 34266-7800

## II        **DEFENDANTS:**

    Joshua Hattaway, Sergeant               Individual Capacity
    Okaloosa Correctional Institution
    3189 Colonel Greg Malloy RD
    Crestview, Florida 32539

    John Reifschneider, Sergeant          Individual Capacity
    Okaloosa Correctional Institution
    3189 Colonel Greg Malloy RD
    Crestview, Florida 32539

    Corey Settlemires, Captain            Individual Capacity
    Okaloosa Correctional Institution
    3189 Colonel Greg Malloy RD
    Crestview, Florida 32539

2

## III    EXHAUSTION OF ADMINISTRATIVE REMEDIES:

The Plaintiff avers that he has met the exhaustion of administrative remedies requirements pursuant to Fla. Stat. § 944.09; and F.A.C. Chapter 33-103 – **"Inmate Grievances**:" as follows:

1.    The Plaintiff filed an (Inmate) "Informal Grievance" On: 10/9/2020, Log # 115-2010-0062, and "did" receive an approved timely response back on 10/23/2020. (See **Exhibit A).**

2.    The Plaintiff filed an "Direct Grievance' (a grievance of reprisal), directly to the "Office of the Secretary" in accordance with F.A.C. Chap-33-103.007(6)(a)3(b), on 12/2/2020; Log # ____-_____-_____, and did not receive any response back. (See **Exhibit** ___)

3.    And also, pursuant to this Complaint, the Petitioner has also filed an (Inmate) Informal Grievance (Re: Capt. Corey Settlemires actions) separately on 12/3/2020, Log # 115-2012-0062 and did receive a approved response back on Feb. 2, 2021. (See **Exhibit C**).

4.    And, the Plaintiff was forced to file this (Inmate) Informal Grievance (Re: his medical condition) at Hardee Correctional Institution on 2/8/2021, in Log# 501-2102-0152, and did receive a approved timely response back on February 20, 2021. (See **Exhibit D**).

3

**IV**      **PREVIOUS LAWSUITS:**

**A.**      **No**  I have not initiated any other similar action in the state court dealing with the issues involved in this action.

**B.**      **Yes –** I have initiated another action in "federal court" dealing with similar issues involved in this action.

**(1)**      **PARTIES TO PREVIOUS ACTION:**

(A) Plaintiff

Eric L. Walker, II, DC# W17028

(B) Defendant(s)

1. Ryan Day, Sergeant

2. George Cook, Sergeant

3. D. Danio, Sergeant

4. M. Lowe, Sergeant

5. Brandon Robinson, Sergeant

**(2)**      **Case # 3:21-cv-888-LC-ZCB      Judges:**

Senior Judge, Lacey A. Collier

(Former) Magistrate Judge, Elizabeth M. Timothy

(New) Zachary C. Bolitho

**(3)**      **Case Filed In:**

U.S. District Court

Northern District of Florida

Pensacola, Division

(4)     **Date Filed Was:**

July 1, 2021

(5)     **Case Status:**

Still Pending

(C) **Yes**, I previously initiated a Federal Habeas Corpus petition on July 12, 2017, challenging the conviction of his case.

1. **Plaintiff:**

Eric L. Walker, II, pro se

2. **Defendant:**

State of Florida

3. **Judges:**         **Case No:**

Unknown

4. **Filing Date:**

July 12, 2017

5. **Case Status:**

Closed August 1, 2019

5

### 6. **Summary of Motion:**

Denied (without written opinion)

### 7. **Grounds Issues Raised:**

Challenged Sentence and Conviction in Eleven (11) assignments of error

(D) **No**, I have never had any action in Federal Court dismissed as frivolous, malicious, failing to state a claim, or prior to Service.

## V          **STATEMENT OF FACTS:**

1.      On Monday, November 30, 2020, the Petitioner / Plaintiff (here), Eric L. Walker, II, was assigned to confinement cell # E-3110 (low) at Okaloosa Correctional Institution when he was awakened from his sleep at around 7:00 a.m. By a officer telling him that he had a medical call-out, and asking him if he was going.

2.      Upon further inspection, Inmate Walker recognized the person asking as Sgt. J. Hattaway, a person he had recently 'written up' in an informal grievance on October 2, 2020. (See **Exhibit A**, Walker's Informal Grievance on Sgt J. Hattaway).

3.      The threat made to Inmate Walker was made to him during a time when he had been healing and recovering from a broken right-arm stemming from an incident that had occurred previously on August 19, 2020. (See U.S. District Court; case no: 3:21-cv-888-LC.ZCB).

4.      (During the August 19, 2020, incident Walker's upper right-arm had been broken in four places, completely crushed, splintered and extremely swollen, to twice its normal size. Yet, Inmate Walker had been hidden inside of a stripped confinement cell, and denied his many requests to access medical personnel by Okaloosa Correctional Institution's confinement officers).

7

5. The threat made to Inmate Walker was made to him on October 2, 2020, by Sergeant Joshua Hattaway, was that he would break Walker's other arm, if he continued to write out a Witness Statement (DC6-112B), for another Inmate (Gerald Smith, DC# V25599) who had been previously assaulted by other officers at Okaloosa Correctional Institution. (See **Exhibit E**, Walker's Personal Affidavit; Re: Inmate Gerald Smith's Assault).

6. Because of the previous threat made to Inmate Walker and his subsequent filing of an Informal Grievance (Complaint) regarding it, Walker had at first felt very uncomfortable about allowing this correctional officer to escort him to a medical appointment, but...

7. Upon further inspection, Inmate Walker could see "yellow-spray paint' stains on the security restraint chains (set) held by the attending transport/ escort officer's, Sgt. J. Hattaway, Sgt. J. Reifschneider and T.A. (Training Assistant) Officer W. Garcia, which indicated that Walker's Medical Appointment would not be in-house, (meaning at the institution), but instead, indicating another out-side medical appointment / transpiration back to Blue water Orthopedics in Crestview, Florida.

8. This outside transportation would have been Walker's (third) scheduled appointment back to Blue water Orthopedics and was for the evaluation

8

and/or repair of his broken right-arm, hand and wrist.

9.    During his last previous visit to Blue water Orthopedics, Inmate Walker had been seen by Doctor W. Markoski regarding the possibility of having surgery to repair and/or reconnect the nerves of his right hand and wrist, damaged during the august 19, 2020 incident, therefore, Walker knew that he could not afford to miss this very important (scheduled) appointment back to Blue water Orthopedics and so decided against better judgment to go ahead and attempt to come out of his cell for the medical call-out/appointment, before him.

10.    On this day, Monday November 30, 2020, Inmate Walker had been housed in Okaloosa Correctional Institution's confinement cell #E-3110 (low), where he had been placed and relocated to as of October 1, 2020, subsequent to the assault and battery of Inmate Geraid Smith, just two days prior, on September 29, 2020. (See **Exhibit E**, Petitioner's Affidavit).

11.    Due to Inmate Walker having been accused of assaulting a correctional officer during the August 19, 2020 incident, ... the placement in cell E3110 low, came with an automatic enhanced security status which labeled Inmate Walker as a Heightened Security Inmate.

12.    Heightened Security Inmates are directed along a specific protocol-procedure whenever they are to be removed from their cells, to go anywhere and

9

for any reason. Prior to the morning of November 30, 2020, the Heightened Security Protocol Procedure for all inmates had been to first be cuffed-up from the front by sticking their hands out of their tray/food flaps, on their cell door, at the front of their cells, next they were directed to turn around with their backs to the cell door as it was being ordered open. Once it was opened an inmate would next be directed to slowly back out, stop, then kneel down onto both knees just outside of the cell's doorway so that all of a inmate's actions could be recorded on the wing's fixed video recording camera devices, as an officer safely and securely placed iron shackles around a Heightened Security Inmate's legs.

13.    ...But on this day Sgt. Joshua Hattaway had decided to switch-up the Heightened Security Protocol (Procedure) by directing Inmate Walker not to back out of his cell, but to instead just kneel down just inside of his cell's doorway so that he could just lean in and place leg shackle restraints around Walker's ankles from standing just outside of Walker's cell doorway.

14.    At first, due to the change in the Heightened Security Protocol Procedure (...and the officer who was making the change), Walker had began to feel very apprehensive about coming out of his cell but with the need to repair his broken arm and hand and two other officers being present, Walker just shook the bad vibes off, just so that he could make it out to his outside medical appointment

with Blue water Orthopedics.

15.    ...But after first securely placing leg shackle restraints around Walker's ankles, Sgt. Hattaway just brushed his way past Walker to enter into his cell and stood before him. **"At no time are any officers supposed to enter into a Heightened Security Inmate's cell and be off camera with him; without the assistance of a hand-held recording device, but again,**...Due to the presence of the other two officers in the cell with him as well, Walker did not say anything about this, but decided to just keep his cool.

16.    At first, Sgt Hattaway had just acted normal as if he had only been explaining to the T.A., Training Assistant, Officer W. Garcia how to properly apply a black box restraint over the key pads of the handcuffs worn by Inmate Walker, but after this things begin to go astray.

17.    Sgt. Hattaway next, for whatever reason, chose to toss the inmate waist chain over the top of Walker's head, catching him by the back of the neck, then criss-crossing the front ends of the chain hand over hand around Walker's throat choking him while telling the Training Assistant, Officer W. Garcia, "...This is what you do to a inmate who pisses you off..."

18.    After having just gotten assaulted by several officers at this same institution, Walker had tried his best not to freak-out, at this point, and Sgt.

Hattaway did shortly remove the chains from around Walker's neck, but as Walker chose to address the T.A. (Training Assistant) Officer and tell him, "...**Don't listen to him, that 's how you end up in court with your co-workers testifying against you...**"

19.     (Due to Inmate Walker even opening his mouth to begin to say anything), Sgt. Hattaway grabbed Walker by the throat, tightening his grip in intervals saying "Hey, hey, hey", until Walker having had completed his statement, Sgt. Hattaway shoved Walker's head back against the corner wall behind Walker – This had caused Walker to black out, as the next thing he could tell was that he was on the other side of his cell, wondering "how" he had gotten there and wondering why he could tell that he was loudly yelling out something but could not hear the sound of his own voice and with a total, over-all feeling as if he had been under water and was just then resurfacing.

20.     In that exact moment Walker had not fully known what was going on around him but at the sight of seeing the officer wrapped around him and knowing what had happened to him before Walker's first thought were to immediately get up out of the cell and out on to the wings camera so that the officer could not intentionally re break his healing recovering broken right arm and then claim it was only an accident.

21.    But just as Walker made a break for the cell's door, at the front of his cell, Sgt. Hattaway football tackled him around the waist and slammed him over onto the empty bottom lower bunk of the cell's bunk.

22.    A struggle ensued to where Walker who having had some specialized training, (and too much personal experience), in this type of up-close hand to hand , close quarters styled battling, instinctively knew not to allow this big overgrown sized kid to gain a sitting position, straddling him across his abdomen and chest area but...

23.    Sgt. Hattaway had the advantage of using the iron leg shackles chain around Walker's ankles (by sticking his feet in between the leg shackles chain connected to each of Walker' legs and stretching out). To effectively pin Walker's legs down which allowed him to squirm his way up into a sitting position upon Walker's waist-line and abdomen area. After gaining this position Sgt. Hattaway "immediately" went to hammering away upon Walker's head, face, and body with closed fist.

24.    This went on for all of (10-15) minutes with Sgt Hattaway alternating from: **A)** pulling Walker's left arm over the edge of the metal bunk trying to break it, as per his previous threat to do so; **B)** grabbing Walker's thumb and middle finger of his left hand trying to break them; **C)** slamming Walker's head over and

13

over, up and down on the medal bunk; **D)** using the wrist restraints to pull Walker's hands down and away from blocking and covering is face. **E)** and because he had been unable to break any of Walker's fingers and bones Sgt. Hattaway had become very irate and frustrated and at one point had just grabbed Walker by the throat using both hands and had choked Walker out until Walker had passed out. This had been the same year that a black man had been choked to death by a white police officer in Minneapolis, MINN and Walker had thought to himself "Damn, he's trying to 'GEORGE FLOYD' me..." (… Walker had not been passed out long because when he did begin consciousness, Sgt Hattaway had again had Walker's left hand middle finger bent over backwards (again) trying to break it for like the fifth or sixth time, but this time being able to use both of his hands due to Walker having been passed out).. But once Walker had awoken he was able to (again) thwart Sgt. Hattaway from breaking his finger. **F)** Being unable to break any of Walker's bones particularly frustrated and angered Sgt. Hattaway so instead of dropping down to use both hands to choke Walker out again, Sgt. Hattaway dropped down to grip Walker's head and face with both hands to jam his right hand thumb deep into Walker's left eye.

25.    At this last part Walker had only been able to cringe and brace himself expecting his eye to pop at any moment, but somehow Walker was able to roll over

14

quickly to break Hattaway's grip. ... from around his face, this movement enabled him to look up at the cell's doorway to see Sgt. J. Reifschneider just standing there to the inside corner of his cell's doorway (the same corner where his head had first been slammed back against the wall).

26.    Sgt. Reifschneider had just been standing there with his left arm sticking out across the cell's doorway blocking, keeping the TA Officer W. Garcia from (re—entering) the cell at this moment Walker had immediately understood why no other officers had come to stop the altercation and this was because Sgt. John Reifschneider had not called the altercation in.

27.    This had really pissed Inmate Walker off as he knew in that moment that this corrections officer had been intentionally stalling and allotting his fellow officer the time and opportunity to pop break and otherwise mangle Walker's fingers limbs and bones, which is why Sgt Reifschneider has been included (here) as a Defendant, and also because even after watching Sgt. Hattaway choke Walker out just after the incident in Minnesota, Sgt. John Reifschneider still chose to do nothing to stop the altercation before him, not even to call it in, to get some back up, to cover himself.

28.    On the other hand, Walker could tell that the TA Officer W. Garcia had at least seemed shocked and appalled at what he was seeing and had been at

15

least trying to reenter the room to stop or intervene upon the situation, but was held back from doing so by a officer that was training him.

29.    Walker had to call out to the wing of other inmates to get them to kick on their cell doors to get some attention on the wing to raise the alarm for someone else to come and see what the problem was. The kicking and banging on their cell doors and yelling out of their cell window to the general compound brought a few officers running.

30.    A few moments later Walker heard the approach of someone's walkie talkie radio to which he looked up to see Sgt M. Lowe, the dormitory's confinement sergeant as he rounded the corner to look into Walker's cell to see what was happening. Upon seeing his co-worker, Sgt. Hattaway pummeling Inmate Walker with blows Sgt M. Lowe hurriedly turned around and walked off "Yelling" for the other inmates to quit their yelling and to get off of their cell door window to stop them from further observing what was going on and happening to Inmate Walker.

31.    At this Walker could only tuck his head up under his shoulders as he tried to take a moment to think of a way out of a never-ending situation. After just having had recently regained his own consciousness....when Walker did manage to look up a few minutes later, Walker was shocked and surprised to see a white shirt,

O.I.C. Captain C. Settlemires present and just standing; 'John Wayne' (hands on hips) style, just to the inside of the cell's doorway as if he was trying to use his (large) body size to block the doorway from the view of the other inmates in their cells behind him.

32.    Capt. Settlemires had been just standing there watching as one of his officers beat away on Inmate Walker who was handcuffed, shackled and not fighting back. At seeing Inmate Walker look up to notice him present on the scene Capt. Settlemires came alive and overly animated, yelling for Inmate Walker to "stop resisting", even though he could see that Inmate Walker was not resisting at all.

33.    ***Capt. Settlemires had worn a body-cam (video recording) device clipped to his shirt, but at no time did he activate this device.***

34.    Capt. Settlemires next slowly made his way over to Sgt. Hattaway's left-ear and leaned down to whisper something to him. To which Sgt. Hattaway "obeyed" and ceased hitting Inmate Walker with his closed fist. Capt. Settlemires then directed Sgt. Hattaway to roll Inmate Walker over and to then remove the handcuffs from Inmate Walker's wrist.

35.    Next, Capt. Settlemires ordered someone to replace Walker's cuffs but this time to the back. After this Walker was stood up to where he noticed that two

other officers had already been standing at the back of his cell laughing away, snickering at the fact that Inmate Walker had been battered (AGAIN).

36.    Capt. Settlemires directed the other two officers to escort Walker out of the cell but upon noticing Inmate Walker's head and face being covered in blood, Capt. Settlemires stopped the procession from leaving out of the cell as he ordered another officer to run and go fetch him a Inmate Spit Shield, and when one was brought back Capt. Settlemires ordered it to be placed over Walker's head, face and neck, which when it was applied did lessen the impact of Walker's own blood running down fresh over his head and face as he was brought out of the cell and out onto the hand held, post use of force camera.

37.    Upon sitting down in the nurses examining room station, for a post use of force examination by Nurse S. Green, the escort officer to his left-arm (side), Sgt. C. Taylor began pinching the back underside of Walker's left-arm (AGAIN), trying to goad Walker into snatching away and/or bucking in what he hoped would lead to another assault upon Walker's person. The female nurse S. Green interviewed and had directed Sgt Taylor to cut the crap and...directed Inmate Walker to focus on her and not anyone else, and as Walker did this, the rest of the post use of force exam went without incident.

38.    Upon being returned  to his cell after this post use of force exam,

Capt. C. Settlemires had been the one to remove the handcuffs from Inmate Walker's wrist, to where Walker immediately turned around to tap on the glass window to tell Captain Settlemires that "This had been his second time allowing his officers to jump on him (in handcuffs) and that he would be filing paper work on him."...at this Capt. Settlemires' face turned beet red and he then turned around walked off a few paces and begin yelling and screaming at the whole entire wing of inmates saying: "[A]ll right, ya'll want to play? Well daddy;s home! This is my house. I run this shit and ya'll are going to learn today! ... "I'm going to come back with a camera, place you, you, and you on camera, give each of you a standing verbal order, then come back and gas your asses one-by-one!" Before storming off the wing.

39.    Approximately 15-minutes later, even though no body had been talking or making any noises at all, Capt. Settlemires still followed through with his threat and sprayed several inmates on the wing. One of these inmates had been a white male inmate. Inmate Darrel Ward, DC#119606 who had been housed right next to Inmate Walker in confinement cell E3109-low.

40.    When Inmate Ward had asked to what he had done to be sprayed, Inmate Ward had been told "...When we were kicking that boy's ass you were yelling through the vent taking up for your "Nigger Friend." See **Exhibit F**,

Personal Affidavits of other Inmates). (***A number of other inmates had written out their own personal Affidavits this day and given them to Walker advising him to call them all as witnesses.***).

41. This had concluded everything for which had occurred on the morning of November 30, 2020 but, (AGAIN), just 3-days later on Thursday, December 3, 2020, Capt. C. Settlemires did again put Walker's life in danger as he being the lead officer on a medical escort, had the only camera present, clipped to his shirt, Capt. Settlemires first sent the only black officer present off on a errand. Then him, his-self, walked off with the recording body cam clipped to his shirt, leaving Walker alone with a white male officer, who was also known for jumping on inmates.

42. This Officer M. Duncan, did try to engage Inmate Walker by asking him a question in order to try to incite Walker, but Walker just ignored him. When Capt. Settlemires did return to see that nothing had happened Capt. Settlemires himself became very irate and...did all that he could to disrupt and prevent the further evaluation of (all) of Walker's injuries by the X-ray Technician Lady, Ms. A. Hammermin, so that Walker's injuries would not (all) be documented and recorded.

43. Inmate Walker sustained injuries to his left collarbone; a shoulder

fracture; multiple lacerations to the crown of his head; bruising and swelling around his left hand's middle finger knuckle, neck, face and arms; plus a puffy red and irritated left eye for which J. Hattaway, had dug his finger into. \*\*\*Walker's surgery to correct this fracture to his collarbone was set for May 21, 2021, but at the time Walker did not feel safe at the Lake Butler regional Medical Center and did so chose to opt out of surgery then until a later date.

## VI.   STATEMENT OF CLAIMS:

The Plaintiff claims that his rights under the Eighth and Fourteenth Amendments were violated on November 30, and December 3, 2020 when he was subjected to:

**(A) Retaliation; and Deliberate Indifference by these (3) Officer Defendants:**

1. Sergeant Joshua Hattaway

2. Sergeant John Reifschneider

3. Captain Corey Settlemires

These officers of the Florida Department of Corrections did intentionally and/or negligently did participate in the retaliation of the Plaintiff for exercising his right to file an complaint and/or grievance regarding his mistreatment, threats, and abuse by any officer employed with the Department of Corrections, and with reckless disregard for the safety and well-being of the Plaintiff, and did fail to protect him as he was being assaulted by a fellow officer – Prison Guard.

**(B) Cruel and Unusual Punishment; and Excessive Use of Force**, resulting in serious bodily injury by the following Defendant.

1. Sergeant Joshua Hattaway

This Officer of the Florida Department of Corrections did act individually to

violate the Plaintiff's right to be free from (1) corporeal punishment and degradation; (2) his right to be free from the unnecessary wanton infliction of pain at the hands of prison officials.

**(C)     The Interference with a Medical Examination**, resulting in the delay and timely treatment of injuries by the following Defendant:

1.     Captain Corey Settlemires

This officer of the Florida Department of Corrections did act wantonly to violate the Plaintiff's (Rights to the uninterrupted medical care and proper diagnosis of his injuries by Medical Care Personnel and evaluations).

**(D) The International Infliction of Mental and Emotional Distress** – due to the repeated assaults and/or threats made by these officers Defendants:

1.     Sergeant Joshua Hattaway

2.     Captain Corey Settlemires

These officers of the Florida Department of Corrections did individually act to violate the Plaintiff's (Rights to be free from corporeal punishment and degradation; cruel and unusual punishment and free from the intentional infliction of mental and emotional distress.

23

## VII.      **RELIEF REQUESTED:**

The Plaintiff is requesting (1) $3,500.00 to be paid (Individually) by each Defendant, prior to an assistance from any insurance policy; (2): $350,000.00 in compensatory damages for the pain and suffering done at the hands of prison officials; (3): $500.000.00 in punitive damages to discourage and penalize the reoccurring theme of violence and illegal acts of prison guards against inmates in their care, in the future; (4): and any other relief deemed necessary and appropriate by this Court.

Respectfully submitted,

/s/

Eric L. Walker, II, *pro se*
DC# W17028

24

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I placed this Complaint into the hands of a prison official for mailing via: U.S. Mail to: U.S. District Court Northern District of Florida at, 1 North Palafox Street Pensacola, Florida 32502

Executed this _____ day of _____, 2022.

/s/ _____

Eric L. Walker, II, *pro se*
DC# W17028
DeSoto Correctional Inspection Annex
13617 Southeast Highway 70
Arcadia, Florida 34266-7800

25

# A
# (Informal)

Grievance Complaint
Filed on:

10/09/2020

Re:

Sgt. J. Hattaway

# EXHIBIT A

# INMATE REQUEST

**STATE OF FLORIDA**
**DEPARTMENT OF CORRECTIONS**

GRIEVANCE

Mail Number: _____
Team Number: _____
Institution: OKA. C.I.

| TO: (Check One) | ☑ Warden ☐ Asst. Warden | ☐ Classification ☑ Security  Tyler | ☐ Medical ☐ Mental Health | ☐ Dental ☐ Other |
|---|---|---|---|---|

| FROM: | Inmate Name ERIC WALKER | DC Number W17038 | Quarters E3110-L | Job Assignment N/A | Date 10-9-80 |
|---|---|---|---|---|---|

**REQUEST** Check here if this is an informal grievance ☑

ON OCT. 2, 2020, I WAS � THREATENED BY A SGT. J. HATTAWAY THAT IF I WROTE A D.R. WITNESS STATEMENT FOR INMATE GERREL SMITH #V25599, THAT HE WOULD BREAK MY OTHER ARM - REFFERING TO MY RIGHT ARM THAT WAS RECENTLY BROKE BY STAFF, I AM A WITTNESS TO INMATES SMITH D.R. AS I WAS IN THE ISOLA-TION CELL NEXT TO SMITH AND I HEARD EVERTHING HE SAID, HE TOLD COLONEL J. JONES, ▆▆▆▆ AND GANG SERGENT - SGT. KOBASACK THAT HE COULD NOT SEE WITHOUT HIS GLASSES AND AFTER I HEARD SEVERAL STAFF THREATEN INMATE SMITH'S LIFE FOR ▆▆ REFUSING TO HAND OVER HIS EYEGLASSES, INMATE SAID "YA'LL GONE KILL ME BOUT "MY" EYEGLASSES THEN LET YO GO, I'M READY TO DIE. OTHER THAN THOSE WORD'S SMITH NEVER THREATENED ANY BODY AND I AM A WITTNESS TO THE STAFF PULLING HIM OUT HIS CELL, PULLING AT HIS BOXER'S INFRONT OF ME AND SEVERAL OFFICER REACHING HIS BOXER TO LOOK FOR THE GLASSES AND SMITH FALLING OVER SCREAMING "PRIA". I WOULD LIKE TO GIVE A FULL STATEMENT TO THE I.G. WITHOUT THE THREAT OF HAVING MY ARMS BRAKEN (AGAIN)...

All requests will be handled in one of the following ways: 1) Written Information or 2) Personal Interview. All informal grievances will be responded to in writing.

| Inmate (Signature): E. Walker | DC#: W17038 |
|---|---|

---

**DO NOT WRITE BELOW THIS LINE**

RECEIVED

## RESPONSE  115-2010-0062                    10b

DATE RECEIVED: OCT 12 2020

Informal Grievances
Okaloosa C.I.

The issue of your complaint has been Referred to the investigative section of the Office of the Inspector General for appropriate action. Upon completion of necessary action, information will be provided to appropriate administrators for final determination and handling. This may or may not Result in a personal interview with you. As action has been initiated, you may consider your appeal approved from that standpoint. This does not constitute substantiation of your allegations.

[The following pertains to informal grievances only:]
Based on the above information, your grievance is ___APPROVED___. (Returned, Denied or Approved). If your informal grievance is denied, you have the right to submit a formal grievance in accordance with Chapter 33-103.006, F.A.C.

| Official (Print Name): C. Tyler | Official (Signature): C. Tyler | Date: 10-20-20 |
|---|---|---|

Original: Inmate (plus one copy)
CC: Retained by official responding or if the response is to an informal grievance then forward to be placed in inmate's file
This form is also used to file informal grievances in accordance with Rule 33-103.005, Florida Administrative Code.

Informal Grievances and Inmate Requests will be responded to within 15 days, following receipt by staff.
You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal, completing the form as required by Rule 33-103.006, F.A.C., attaching a copy of your informal grievance and response, and forwarding your complaint to the warden or assistant warden no later than 15 days after the grievance is responded to. If the 15th day falls on a weekend or holiday, the due date shall be the next regular work day.

DC6-236 (Effective 11/18)

Incorporated by Reference in Rule 33-103.005, F.A.C.

# B
## (Direct Reprisal)

Grievance Complaint
(To The Office Of The Secretary)

Filed On:
12/02/2020

Re:

Sgt. J. Hattaway

# EXHIBIT B

# C
## (Informal)

## Grievance Complaint
## Filed on:

## 12/03/2020

## Re:

## Captain C. Settlemires

# EXHIBIT C

**STATE OF FLORIDA**
**DEPARTMENT OF CORRECTIONS**

**INMATE REQUEST**

"*GRIEVANCE...*"

Mail Number: _____
Team Number: _____
Institution: OKA (MAIN)

**TO:** (Check One)
- ☐ Warden
- ☐ Asst. Warden
- ☐ Classification
- ☒ Security ) 106
- ☐ Medical
- ☐ Mental Health
- ☐ Dental
- ☐ Other _____

| FROM: | Inmate Name | DC Number | Quarters | Job Assignment | Date |
|---|---|---|---|---|---|
| | ERIC WALKER, II | W17028 | E3/10 | N/A | 12.3.2020 |

**REQUEST** GRIEVANCE...

Check here if this is an informal grievance ☒

I AM filing THIS INformal GRIEVANCE ON THE FACT THAT YESTERDAY CAPT. C.M. SETTIEMIRES WAS USING THE FACT THAT [REDACTED] E·DORM (WING·3) DOES NOT HAVE "AUDIO" CAPUBILITIES TO UN·JUSTIFIABLY PEPPER SPRAY ANY INMATE EVEN WHEN THEY ARE COMPLYING FULLY WITH HIS ORDER'S. THIS HAS BEEN GOING ON FOR QUIET SOME TIME NOW! INMATES ARE BEING SUBJECTED TO "CRUEL AND UNUSUAL PUNISHMENT" AND THE INSTITUTION'S FAILURE TO ADDRESS THESE ISSUES RAISED HAS RESULTED IN "DELIBERATE INDIFFERENCE"... WHICH IS IN CONSTITUTIONAL Violation of RIGHTS UNDER THE 8TH AMENDMENT. YESTERDAY, I WATCH CAPT. SETTIEMIRES THREATEN A WHOLE ENTIRE WING B/c THIS WING has no AUDIO on!... AND THEN Follow-up HIS THREAT BY placing (4) INMATES AT RANDOM ON CAMERA, THEN "GASSING" (3) OF THEM EVEN THOUGH, NIETHER ONE OF THEM WERE VIOLATING ANY OF HIS COMMANDS. –THIS Accured (MON). NOV 30TH 2020 (? P)

All requests will be handled in one of the following ways: 1) Written Information or   2) Personal Interview. All (7-10hrs.) informal grievances will be responded to in writing.

Inmate (Signature): Eric Walker  W17028      DC#: W17028

**RECEIVED**

**DO NOT WRITE BELOW THIS LINE**

**RESPONSE**      **DATE RECEIVED:**    DEC 0 7 2020

115-2012-0062                          Informal Grievances Okaloosa C.I.

The issue of your complaint has been Referred to the investigative section of the Office of the Inspector General for appropriate action Upon completion of necessary action, information will be provided to appropriate administratices for final determination and handling. This may or may not Result in a personal interview with you. As action has been initiated you may consider your appeal approved from that standpoint. This does not constitute substantiation of your allegations

[The following pertains to informal grievances only:]

Based on the above information, your grievance is __APPROVED__. (Returned, Denied, or Approved). If your informal grievance is denied, you have the right to submit a formal grievance in accordance with Chapter 33-103.006, F.A.C.]

Official (Print Name): C. Tyll   Official (Signature): ___   Date: 12-15-20

Original: Inmate (plus one copy)
CC: Retained by official responding or if the response is to an informal grievance then forward to be placed in inmate's file
This form is also used to file informal grievances in accordance with Rule 33-103.005, Florida Administrative Code.

Informal Grievances and Inmate Requests will be responded to within 15 days, following receipt by staff.
You may obtain further administrative review of your complaint by obtaining form DC1-303, Request for Administrative Remedy or Appeal, completing the form as required by Rule 33-103.006, F.A.C., attaching a copy of your informal grievance and response, and forwarding your complaint to the warden or assistant warden no later than 15 days after the grievance is responded to. If the 15th day falls on a weekend or holiday, the due date shall be the next regular work day.

DC6-236 (Effective 11/18)

Incorporated by Reference in Rule 33-103.005, F.A.C.

# D
## (Informal)

Grievance Complaint
and
(Some) ...)

Medical Records

Grievance Filed On: February 8, 2021

# EXHIBIT D

# E
## (Petitioner's)

Personal Affidavit

Written: 10/09/2020

Re:

Inmate Gerald Smith DC# V25599;
Assault On: September 29, 2020

# EXHIBIT E

## AFFIDAVIT

**Comes now**, I, Eric L. Walker, II, DC# W17028, states in this Affidavit / Witness Statement a true testimony of what I saw and heard on Tuesday, September 29, 2020.

1.  I was housed at Okaloosa C.I. S.H.O.S. / medical cell F-102S. I had been housed in this Okaloosa C.I.'s infirmary / confinement cell stemming from an incident on Wed. August 19, 2020, where my right arm was broken.

2.  I had been standing at my cell door looking out the window, when Sgt. Campbell and another unknown officer escorted inmate Gerald Smith, DC #V25599, into the medical / infirmary hallway, via the backdoor, to be placed in S.H.O.S. / medical infirmary cell F101-S, next to me, for "dry-cell" observations.

3.  A "dry-cell" observation is where an inmate who is suspected of containing or possessing contraband upon his person (*i.e.*, drugs or cell phones in his anus or possibly ingested), is watched and observed until that inmate has an observable bowel movement.

Inmate Smith was directed to hand over all of his clothing items after being placed in the medical infirmary / dry-cell. After doing so, inmate Smith was directed by Sgt. Campbell to also hand over his

1

glasses, glasses that inmate Smith was wearing on his face at the time. At this, inmate Smith questioned, "My glasses?   What do my glasses have to do with me being in a dry-cell?"

5. The same escort Sergeant, Sgt. Campbell, tried unsuccessfully to explain to inmate Smith why he had to remove his eyeglasses, along with his clothing, to which inmate Smith responded, "But that don't make no sense.   What do my glasses have to do with me being in a dry-cell?"

6. Inmate Smith further stated, "I can't see without my glasses.   I'm practically blind without my glasses.   So, you mean to tell me I have to walk around in here blind, because ya'll can't read a medical chart right and think I'm 'housing' a cellphone up my ass!"

7. A Captain Willis was called to alleviate the situation, who upon his arrival immediately began to yell, threatening inmate Smith with bodily harm if he did not hand over the eyeglasses that very second. Inmate Smith, who sounded very incredulous at having his life threatened so easily and venomously, asked, "You mean to tell me your going to 'kill me' for not giving you my eyeglasses? Alright, kill me, then.   Kill me, then.   Go ahead.   I promise you, you won't get away with it."

2

8. At this, Captain Willis began to realize that the aggressive tactics were not working, but only inflaming the situation more. So, he tried to switch tactics by telling Smith, "Look, just let me inspect the glasses, and I'll hand them right back."

9. At this, Smith replied, "Oh really. How am I supposed to trust and believe you now, after all you just said and done to me? You just cussed me out and threatened my life, all about my glasses."

10. Inmate Smith further stated, "Now, I'm supposed to believe you when you tell me you're just going to inspect them and give them back? If you had come like that from the beginning, I would have, but naw, now I can't trust you, so no, I'm not going to let you 'trick' me into giving up my glasses, because I need them. I can't see without them. And you can't give me a good reason why I can't have them, so no!"

11. At this, Captain Willis tried to assure Smith that he was a man of his word, and that if Smith allowed him or anyone of his officers to inspect the glasses, that inmate Smith would get them back. Inmate Smith said, "I don't believe you or trust you to honor your word. I think this is just a trick to get me to give up my glasses and leave me blind in this cell."

12. At this, Captain Willis spoke with Sgt. Campbell one last time, and

3

left. Once he was gone, Sgt. Campbell began to explain to inmate Smith how he didn't know where he was at, (*i.e.*, meaning things were about to get a lot worse for him), and that he should have taken the Captain's deal as it was a good deal to take, etc.

13. Inmate Smith replied to Sgt. Campbell that he would have, had the Captain came correct like that the first go-round from the beginning. But how could he when he started out by threatening his life.

14. These two went back and forth for about twenty minutes, not arguing, but verbally disputing facts back and forth "calmly", when Sgt. Campbell said, "Alright, I tell you what. Since my Captain's last word was that he'll give the glasses back, I tell you what. Let me inspect the glasses and I'll give them back." Sgt. Campbell gave his word.

15. Smith said, "Uh, uh. I don't trust you, neither, 'cause you're the one that started all this by trying to take my glasses in the first place." Sgt Campbell said, "I know that, but I'm only a Sergeant. My Captain's word overrides mine. So, going off his last word, if you allow me to just look at the glasses, inspect them for safety purposes, on my Captain's last word, I'll hand them right back, and be done with it. On my Captain's word and mine, deal?"

16. Smith didn't answer out right. I could hear him grunting loudly, as if

4

he was seriously contemplating giving in.   So I, at this point, interjected with my thoughts on the issue, being that these people at this camp ain't playing by the rules, and being that they just broke my right arm and hid me in the box, I told him he should give Sgt. Campbell's deal a try before things got worse for him.

17. At the same time, another officer who had been sitting back quietly, not saying anything, came out the cut snapping like, "Look, I don't got nothing to do with nothing! Just let me look at the glasses. I'll look at them, examine them, and I'll give them back.  I don't got nothing to do with nothing.  He says you can have them back after examination, so I'll give them back.  What'll you say?"

18. As I recognized the speaker's voice as belonging to someone I knew as Officer Abdu, I seconded this, saying, "Yea, yea, he's straight, that Officer Abdu.  Give the glasses to him, and let him look at them, and get the situation over with before it gets too far out of hand."  With no further words, Smith took off his glasses and handed them over to Officer Abdu.

19. I could see Officer Abdu step back under the light, hold the glasses up under the light, and twist, and turn them, as he and Sgt. Campbell looked them over.  I want to say I remember Sgt. Campbell grabbing

5

the glasses and walking them back over to inmate Smith, but not sure. But inmate Smith received his glasses back right away, and this ended the situation, and everything was back to normal for all of about thirty minutes, when in-comes (I guess) the Big Bad Wolf.

20. At approximately 3:30-4:00PM, a new Colonel, Colonel J. Jones, who was new to Okaloosa C.I., as he had just recently been re-assigned to Okaloosa compound, shows up on the scene. After having had just come storming in, Col. J. Jones' first words to Sgt. Campbell was, "Where are the glasses?"

21. The situation about the glasses had been over for at least 30-40 minutes, and things had been calm and at ease, so I could see and understand the confusion and apprehension on Sgt. Campbell's face as he tried to comprehend why this "new" Colonel (his boss's boss) was coming now, asking about the glasses.

22. Sgt. Campbell patiently explained his story to Col. Jones of how his Captain had gave his word that if inmate Smith allowed the glasses to be inspected, then he could have the glasses back, so he and Officer Abdu both had inspected the glasses, and per Captain Willis's last word, gave the glasses back.

23. At this, Col. Jones immediately rushed to inmate Smith's S.H.O.S. cell

6

door and venomously began to yell and trash talk, stating, "You don't run shit around here, you hear me. This is my compound, and I run this shit, ya hear. You think you're about that life? I'm about that life! I'll put my foot so far up your ass, you'll be", etc, etc, etc. (Note: he went on so long without pause or break, quoting so many ignorant inmate verbiages, that I thought to myself that "this guy is institutionalized himself and a certified 'bug'!"

24. Col. Jones told inmate Smith, "Now, I'm going to get this cell-extraction team. Don't put a skirt on and cuff up when I get back. You say you're going to run it, then run it!" Col. Jones said this trying to manipulate inmate Smith into refusing hand restraints when he came back, but Smith did not fall for it. When told to cuff up a few minutes later, inmate Smith submitted to hand cuffs and was directed to walk backwards out of the S.H.O.S. cell to where I could see him stand before me in boxers only.

25. At this point, a search for inmate Smith's "missing" glasses started, with a cell search of S.H.O.S. cell F-101S, but when this did not turn up Smith's missing glasses, a search of his person was initiated next, right in front of me, and what I saw shocked me. Right before me, inmate Smith's boxer band was pulled out in front, as someone looked

7

in, then at the same time, someone else began to do the same thing to the band at his rear. At this, Smith began to protest, "What are ya'll doing? This is illegal, ya'll can't..."

26. Smith never got to finish his statement, because as soon as I saw a hand go down the back of his boxers, Smith began to loudly yell, "PREA!" (referring to the Prison Rape Elimination Act), and immediately I saw another hand go down the front of his boxer shorts, and it seemed to me as if the person was cuffing inmate Smith's balls, and squeezing them hard, because as soon as this person did this, the whole pile of them (Officers and Smith) fell over onto the ground with Smith yelling out, "PREA! PREA! PREA!" over and over again.

27. At some point, Col. Jones came up with the missing glasses saying, "Aww, lookee here. Why'd you break them, whelp?" (But I could see that they were not broken, and when I viewed them later sitting in the officer's station, they still were not broken.)

28. At this point, inmate Smith was stood back up and escorted to the cell he had come out of, and it was at this point that I heard the scuffing sounds of inmate Smith getting assaulted and jumped on, along with Smith's cries of anguish and pain for help. Not even ten seconds into the rumbling sounds, I heard Smith cry out, "My leg, my leg! You're

8

going to break my leg." At this, a muffled voice began to say, "Shut up", which followed the sound of Smith getting "hit" like "smack!" (shut up), "smack!", "Shut up".

29. Then inmate Smith screamed, "Ahhhh". Then Smith snapped, and said, "Fuck it, break it! Go ahead, break it!" he yelled. But I heard Col. Jones' voice come into play now, saying, "Now I said shut the fuck up!" And at this, Smith's demeanor changed, and I could tell he was in real pain now, as I could hear grumbling as if he was trying to contain the pain he was experiencing, but what I heard next hurt me to my heart and still does to this day as I write this. Col. Jones began to direct inmate Smith to, "Now, say I'm a pussy-ass nigger! Say it!" Smith grunted more loudly. Then Col. Jones said it more, "Say it. Say it. Say it. Say I'm a pussy-ass nigger!"

30. From the pain of whatever was being done to him, Smith quickly blurted out a comply to Col. Jones' commands, and the assault ended. A camera was called for, and Post-Use-Of-Force Procedure was held. Sgt. Ryan Day, who had assaulted me, was appointed cameraman, as Sgt. Campbell had refused to participated in any of it. A nurse was called to examine Smith for a Post-Use-Of-Force Examination. Smith was placed back in the same S.H.O.S. cell, and at this point, the

situation was over with, but did not end here.

31. Later on that night, inmate Smith was taken out of his cell and moved over to a confinement cell in E dormitory, and a while after, I overheard the infirmary officer tell another officer, "Yeah, they just got him, again. Good this time, down in Echo." (referring to E dormitory confinement unit).

32. I left out how the nurse had refused to medicate Smith with whatever medicine he was saying he had to take every day at certain times.

33. This ended what I'd seen of what happened to inmate Gerald Smith, DC #V25599, but two days later, on October 1, 2020, a Thursday, I was kicked out of my infirmary cell and relocated to Wing 3 of E dormitory (which at the time was the only wing without audio capabilities). Then the very next day, Friday, October 2, 2020, I was threatened with bodily harm if I wrote a witness statement for inmate Smith. Please review attachments!

34. I filed an inmate grievance on Sgt. J. Hattaway for threatening to break my left arm (while my right arm was still broken from a previous staff assault). Then, approximately sixty (60) days later, on Monday, November 30, 2020, this same Sgt. J. Hattaway came into my "heightened security inmate" confinement cell and beat me for

approximately twelve (12) minutes trying to pop my eyeball or break

my left arm as promised.  Please review case #3:21-000888-LC-EMT.

**Further Affiant Sayeth Naught**

I swear, under penalty of perjury that the foregoing is all that I can

remember seeing and hearing that occurred on the 29th day of September 2020.

Date: Jan 28, 2022              /s/  _E. Walker_

Eric Walker, II, DC# W17028
Hardee Correctional Institution
6901 State Road 62
Bowling Green, Florida 33834

## NOTARY CERTIFICATE

**State of Florida**
**County of __Hardee__**

Before me this day,  __Inmate Eric Walker II__  personally

appeared, and who, after first being duly sworn, deposes and says that the

foregoing is true and correct.



ERICKA LYNN ANDERSON
Commission # GG 910442
Expires September 4, 2023
Bonded Thru Troy Fain Insurance 800-385-7019

/s/  _E S Anderson_
Eric Walker, II, DC# W17028
Inmate ID Card, Produced

Sworn and subscribed before me  on  Jan 28, 2022  .

11



U.S.
FOR
AO
34
AUG
AMG

32502

1000

UNITED STATES POSTAL SERVICE

Eric L. Walker. II
DC# W17028
#Desoto Correctional Instit/Annex.
13617 Southeast Highway 70
Arcadia, Florida · 34266·7800

U.S. District
Northern District
1 North Palafox
Pensacola, Fla.

RECEIVED
AUG 17 2022

PROVIDED TO DES
ON 8-9-22 FOR
INMATE INITIALS
OFFICER INITIALS

LEGAL MAIL